1
2
3
4
5
6
7
8
9
10
11
12
13
14

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

UNITED STATES OF AMERICA,

                    Plaintiff,

          vs.

JIMMY HSIEH,
WILLIAM M. PEREZ,
WAI KAM HO, and
JENNIE WEN CHIN PAU,

                    Defendants.

CRIMINAL CASE NO. 11-00082

**ORDER**
**RE: MOTION TO DISMISS COUNT 2 AND ALL**
**RELATED COUNTS OF THE SECOND**
**SUPERSEDING INDICTMENT**

15      The Motion to Dismiss Count 2 and all related counts of the Second Superseding

16   Indictment, filed by Defendant Wai Kam Ho, came before this court for a hearing on March 15,

17   2013. Co-defendant Jimmy Hsieh filed a joinder to the motion but was not present at the hearing.

18   After hearing the argument from counsel, the court took the Motion to Dismiss under

19   advisement. For the reasons discussed more fully herein, the court sets forth the bases for its

20   decision in **DENYING** the Motion to Dismiss.

21   **I.     BACKGROUND:**

22
23      Defendant Wai Kam Ho ("Ho") moves to dismiss Count 2 (Illegal Gambling Business, in

24   violation of 18 U.S.C. §1955(a) and (b)) and all related counts of the Second Superseding

Indictment (hereinafter "Indictment").[1] *See* Mot., ECF No 234. Co-defendant Jimmy Hsieh

("Hsieh") moves to adopt and join Defendant Ho's Motion to Dismiss. *See* Adoption of and

Joinder in Motions to Dismiss, ECF No. 254. Defendant Ho alleges that the Indictment "fails to

state a charge based upon the recent decision of *United States v. DiCristina.*" *See* Mot., ECF No.

234 at 1. In that case, the U.S. District Court for the Eastern District of New York held that poker

is not gambling under the Illegal Gambling Business Act (hereinafter "IGBA"). *See United*

*States v. DiCristina*, 886 F.Supp.2d 164 (E.D.N.Y. 2012). An appeal of the trial court's decision

in *DiCristina* is currently pending before the Court of Appeals for the Second Circuit.

## II.     UNITED STATES V. DICRISTINA

Defendant DiCristina was charged with operating an illegal gambling business involving

poker games in violation of 18 U.S.C. § 1955. *DiCristina*, 886 F.Supp.2d at 168. DiCristina

moved to dismiss the second superseding indictment on the basis that not only does the

government have to prove that poker[2] is illegal under New York law but also that the

government must prove that poker meets the definition proscribed in the IGBA statute (*i.e.*, it

must be sufficiently similar to the nine games listed in 18 U.S.C. § 1955(b)(2)). *Id.* at 169-170.

Defendant DiCristina contends that in order to be sufficiently similar to those enumerated, the

game in question must be predominately a game of chance rather than skill. Because poker, as

claimed by defendant DiCristina, is predominately a game of skill rather than chance, it does not

meet the IGBA definition of illegal gambling. *Id.*

The court held a pretrial hearing that included the testimony of an expert witness. *Id.* at

171. However, the court reserved its decision and the case proceeded to trial. *Id*. The jury found

---

[1] At the hearing, counsel for Defendant Ho states that the related counts for his client are as follows: Counts 1 and 3-35. The related counts for Defendant Hsieh are the same as Defendant Ho's.

[2] The type of poker referred to in the *DiCristina* court is the "Texas Hold'em," which is the same as the type of poker alleged in the second superseding indictment in this instant case. *See* 886 F.Supp.2d at 168, and Second Superseding Indictment, ECF No. 160.

2

the defendant guilty, after having been instructed that poker constituted gambling under the IGBA. *Id*.

Subsequent to the jury verdict of guilty, the court held a post-trial hearing on the defendant's motion to dismiss. *Id*. Both parties offered testimony from their respective witnesses. *Id*.

## A. Defendant's Expert Witness

The defense presented expert testimony of Dr. Randal D. Heeb, who stated that poker is predominately a game of skill rather than chance. *Id*. at 176. Dr. Heeb summarized the results of his study of 415 million hands of "No Limit Texas Hold'em" that were played online between April 2010 to March 2011. *Id*. at 178. Based on his study, Dr. Heeb found that there is a correlation between a player's skill and the result (amount of money won or lost). *Id*. at 181-82. The more a player is highly skilled in poker, the more winnings he gets to take home. *Id*. Dr. Heeb testified that skills play a big part in poker and that many people make a living playing poker, whereas it is impossible to make a living playing other casino games such as roulette. *Id*. at 176. This fact alone, according to Dr. Heeb, was an independent foundation for his opinion that skill predominates over chance in poker. *Id*.

However, Dr. Heeb did acknowledge that poker also involves an element of chance. *Id*. at 178. Dr. Heeb stated that "[o]n any given hand . . . the probabilities are certainly finite." *Id*. Dr. Heeb further acknowledged that "poker falls in between chess, which he characterized as an almost pure game of skill, and roulette, which he characterized as a pure game of chance." *Id*.

## B. Government's Expert Witness

The Government presented expert testimony of Dr. David DeRosa, who questioned Dr. Heeb's finding. *See generally id*. at 185. First, Dr. DeRosa testified that in Dr. Heeb's analysis,

3

"probably 95 percent of the people who play . . . poker lose money so I don't understand where the skill is. How could it be skillful playing if you're losing money?" *Id.* at 186. Dr. DeRosa asserts that poker players play poker to win money and therefore, in determining success at a session poker, the test should be whether a player profits from playing the game. *Id.* at 185. Second, Dr. DeRosa testified that in determining whether skill or chance predominates, the relevant frame of reference should be a single hand because there is no requirement for a poker player to play forever. *Id.* at 186. A poker player can drop out any time during the game. *Id.* Third, Dr. DeRosa testified that the presence of persistent winners and losers does not prove that skill predominates over chance in poker, because such result is normally from random chance variation. *Id.* at 187. Finally, Dr. DeRosa questioned Dr. Heeb's data and methodology. *Id.* at 189.

In response, Dr. Heeb stated that "the question of whether skill predominates requires only an examination of the relative importance of skill." *Id.* However, he conceded that only "10 percent to 20 percent of the players in any given game are good enough to win consistently." *Id.* Also, Dr. Heeb acknowledged that "even in a game of 100% skill, the more skillful player could make an error, leading to a win by the less skillful player." *Id.*

## C. *DiCristina* Opinion and Order

DiCristina's argument for dismissal of the second superseding indictment is two-fold. First, DiCristina argues that the government needs to prove that poker is illegal under New York law *and* that poker is illegal under the definition of the IGBA statute. *Id.* 169-70. Second, DiCristina asserts that the illegal gambling games enumerated[3] in the IGBA statute are predominately a game of chance rather than skill, and because poker is predominately a game of skill, it does not

---

[3] Those games are "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein."

4

fit in the definition proscribed in the IGBA statute. *Id.*

The government, on the other hand, argues that the plain language of the IGBA statute does not restrict what kinds of games constitute gambling. *Id.* at 170. The government asserts that the purpose of the IGBA was to curb the funding sources of organized crime (the majority of which comes from gambling) and that the IGBA was passed to assist the states in accomplishing this goal. *Id.* Thus, it follows that any gambling activity that is illegal under state law is "gambling" under the IGBA. *Id.* Additionally, the government argued that poker is a game of chance rather than a game of skill. *Id.*

In its decision, the *DiCristina* court considered the experts' testimony and other studies to determine whether poker is predominately a game of chance rather than skill. It also considered how state and federal courts treat poker, as to whether it is illegal gambling or not. Further, it reviewed the IGBA's legislative history, including its purpose. It also looked at definitions from various dictionaries, and how other federal statutes define gambling. Lastly, it also considered case law from other federal jurisdictions.

The *DiCristina* court reasoned that because both parties' arguments are plausible and that the legislative history of the IGBA is unclear, the court found the statute to be ambiguous and thus applied the rule of lenity. *Id.* at 170. Moreover, the court agreed with Dr. Heeb, the defendant's expert witness, in that poker is predominately a game of skill rather than chance. *Id.* at 234. Accordingly, the court ruled in favor of the defendant by dismissing the second superseding indictment and vacating his conviction. *Id.*

**III.   ANALYSIS**

The IGBA provides, in pertinent part, that:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

5

(b) As used in this section—
    (1) "illegal gambling business" means a gambling business which—
        (i)    Is a violation of the law of a State or political subdivision in which it is conducted;
        (ii)   Involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
        (iii)  Has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
    (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
    (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
. . .

(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1986, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

18 U.S.C. § 1955.

The GUAM CODE ANNOTATED prohibits gambling, specifically the making or accepting of "a wager involving money or anything of monetary value upon the result of any game or contest." 9 G.C.A. § 64.10(a).

**A. 18 U.S.C. § 1955(b)(2) Does Not Define Gambling for Purposes of the IGBA and Violation of 18 U.S.C. § 1955 Requires the Government to Prove Only Three Elements**

The *DiCristina* court held that in order to find a violation of 18 U.S.C. § 1955, the government must not only prove that the gambling business is in violation of a state law but that it must also prove that the game operated constituted "gambling" as defined by the IGBA. The court in *DiCristina* interpreted 18 U.S.C. § 1955(b)(2) as creating a definition of "gambling" for the IGBA, although the court acknowledged that "the IGBA does not provide explicit criteria for what constitutes gambling." 886 F.Supp.2d at 226. Because the IGBA did not explicitly define "gambling," and in light of what the court referred to as "ambiguities in the federal definition of

6

gambling," the court relied on the idea that the "governing criteria must be derived by determining what common characteristics unifies the games listed in § 1955(b)(2) into a cohesive group." *Id.*

A plain reading of 18 U.S.C. § 1955(b)(2) merely provides a non-exhaustive list of examples of gambling activities. Specifically, subsection (b)(2) states that "gambling includes *but is not limited to . . .*" 18 U.S.C. § 1955(b)(2)(emphasis added). It is not prefaced by the verb "means," unlike subsection (b)(1), wherein it defines "illegal gambling business"; or subsection (b)(3), wherein it defines "State." Had Congress intended to define "gambling," it would have done so, as it had done with "illegal gambling business" and "State." Rather, Congress opted to provide examples of what constitutes gambling, noting that it is a non-exhaustive list.

It should be noted that the original language of the IGBA specifically defined illegal gambling as follows: "[T]he term 'illegal gambling business' *means* betting, lottery, or numbers activity which (1) is a violation of the law of a State or political subdivision thereof; (2) involves five or more persons who operate, work in, participate in, or derive revenue from said betting, lottery, or numbers activity; and (3) has been or remains in operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." *See* Illegal Gambling Business Control Act of 1969, S. 2022, 91st Cong., 1st Sess. § 201 (emphasis added). As evidenced by the original language of the IGBA, Congress knew how to use the term "means," followed by a list, when it wished to do so. However, in the end, Congress opted to simply define "illegal gambling business" to mean a violation of state law, plus the other two elements (five or more persons, or 30-days with gross revenue of $2,000 or more), which eliminated the narrow definition of gambling (*i.e.*, applies only to betting, lottery, or numbers activity). When it created the section

7

in question, Congress opted *not* to use the word "means" and instead used the phrase "to include but not limited to." *See* 18 U.S.C. § 1955(b)(2).

It should be further noted that the Ninth Circuit has held that in order to prove "illegal gambling business," in violation of 18 U.S.C. § 1955, only three elements must be established: (1) violation of the law of a state in which the illegal gambling business is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. *See e.g., United States v. Sacco*, 491 F.2d 995, 998 (9th Cir. 1974)(The three elements enumerated in 18 U.S.C. § 1955(b)(1)(i)-(iii) must be established to constitute an offense of illegal gambling business). *See also United States v. Real Property, Titled in the Names of Godfrey Soon Bong Kang and Darrell Lee*, 120 F.3d 947, 949 (9th Cir. 1997)(A gambling operation qualifies as an "illegal gambling business" under 18 U.S.C. § 1955 if the three elements listed in § 1955(b)(1)(i)-(iii) are met. Because the government satisfied each of these elements, the Ninth Circuit affirmed the judgment for forfeiture of the appellant's property because the property was used to conduct an illegal gambling business (cock fighting)); *United States v. E.C. Investments, Inc.*, 77 F.3d 327, 329 (9th Cir. 1996)("Section 1955 prohibits the operation or ownership of 'an illegal gambling business,' which the section defines as 'a violation of the law of a State or political subdivision in which it is conducted.'"); *Cabazon Band of Mission Indians v. Riverside County, State of California*, 783 F.2d 900 (9th Cir. 1986)("The Organized Crime Control Act of 1970, 18 U.S.C. § 1955 (1976) (OCCA) incorporates by reference certain state gambling laws and makes the violation of the state provisions a federal offense."). Defendant Ho did not cite, and this court did not find, any case law from the Ninth Circuit requiring the Government to prove an additional

8

element, which is that illegal gambling business must fall within the purported definition of gambling under 18 U.S.C. § 1955(b)(2).

The only court that appears to have addressed the issue of whether the government must prove that the alleged business activity constituted gambling under the IGBA (subsection (b)(2)) in addition to violating state law, is the Third Circuit in *United States v. Atiyeh*, 402 F.3d 354 (3d Cir. 2005). Below is the discussion of the Third Circuit in *Atiyeh*:

> Finally, Atiyeh argues that the conduct for which he was convicted, becoming a custodian of funds that were wagered or to be wagered, does not come within the limited definition of what constitutes "gambling" under 18 U.S.C. § 1955(b)(2). This argument is flawed. The relevant definition for our purposes is that of an "illegal gambling business," provided for in 18 U.S.C. § 1955(b)(1), not the definition of "gambling" provided for in § 1955(b)(2). The jury found that Atiyeh violated 18 Pa. Cons.Stat. § 5514(4) [Pennsylvania statute], and therefore operated an "illegal gambling business" as defined by 18 U.S.C. § 1955(b)(1). We have held that the mere custodianship of gambling-related funds is sufficient to constitute a violation of 18 U.S.C. § 1955, because such custodianship is considered to be "gambling" under state law even though it may not appear to fit within "gambling" as defined in § 1955(b)(2).

402 F.3d at 372. *Atiyeh* cited to *United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 660 (3d Cir. 2002)("Congress prohibited illegal gambling business as defined under state law . . ."), *superseded and overruled on other grounds*. The *DiCristina* court found the *Atiyeh* decision to be unpersuasive because "[t]hat court did not have the benefit of the extensive briefing on the text and history of the IGBA available to this court. . . [i]t failed to resolve the ambiguities in the text and history of the IGBA."[4] 886 F.Supp.2d at 220. For the same reason as it dismissed the decision in *Atiyeh*, the *DiCristina* court also dismissed an overwhelming majority of cases that have similarly held the same findings as the Ninth Circuit, in that the government needs to only prove that the gambling business is in violation of state law. *See id.*

Although not as extensive as it was in *DiCristina*, the Ninth Circuit did review and

---

[4] The legislative history and ambiguity issues will be discussed *infra*.

9

discuss the legislative history of the IGBA and explicitly noted that:

> The expressed purpose of Congress in enacting § 1955 was to confer federal jurisdiction over "illegal gambling." (*see*, *e.g.*, H.R.Rep. No. 1549, 91st Cong., 2d Sess. 53 (1970), U.S.Code Cong. & Admin.News 1970 p. 4007; S.Rep. No. 617, 91st Cong., 1st Sess. 73 (1969)). The statute focuses on the operation of an "illegal gambling business" which is "a violation of the law of a state or political subdivision in which it is conducted."

*United States v. Dadanian*, 818 F.2d 1443, 1448 (9th Cir. 1987), *abrogated on other grounds.* In *Dadanian,* because the government proved that the establishment in question was in violation of state or local law, the Ninth Circuit found that 18 U.S.C. § 1955 was applicable to the defendants. *Id.* at 1449.

It is worth noting that courts from the *DiCristina* circuit as well as other jurisdictions have upheld convictions under the IGBA for gambling activities including poker. *See, e.g.*, *United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990)(receiving profits from a high stakes poker operation); *United States v. Zannino*, 895 F.2d 1, 4 (1st Cir. 1990)(involves high stakes poker games); *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)(operating electronic "joker-poker" machines);[5] *United States v. Reitano*, 862 F.2d 982 (2d Cir. 1988)(rough-and-tumble blackjack); *United States v. Rieger*, 942 F.2d 230 (3d Cir. 1990)(operating high stakes poker operation); *United States v. Tarter*, 522 F.2d 520 (6th Cir. 1975)(operating poker games); *United States v. Pack*, No. 92-3872, 1994 WL 19945, at *1 (6th Cir. Jan. 25, 1994)(gambling business involving illegal poker machines and conducting poker games, among other games); *United States v. Tucker*, 638 F.2d 1292 (5th Cir. 1981)(blackjack); *United States v. Useni*, 516 F.3d 634 (7th Cir. 2008)(bingo); *United States v. Dadanian*, 818 F.2d 1443, 1448 (9th Cir. 1987)(poker club); *United States v. Zemek*, 634 F.2d 1159, 1163-64 (9th Cir. 1980)(gambling included blackjack and pot limit poker games).

---

[5] The *DiCristina* court distinguished *Gotti* in that the type of poker involved in *Gotti* was Joker Poker, which, according to the *DiCristina* court, involves significantly less skill than the live Texas Hold'em games operated by defendant DiCristina. *See DiCristina*, 886 F.Supp.2d at 226.

The *DiCristina* court cited two cases that "implied that the government must prove that the business ran games that also constituted 'gambling' as defined by the IGBA." 886 F.Supp.2d at 221, citing to *United States v. Hunter*, 478 F.2d 1019 (7th Cir. 1973); and *United States v. Kaczowski*, 114 F.Supp.2d 143 (W.D.N.Y. 2000). Neither of these cited cases provided any analysis of the issue at hand. In *Hunter*, the issues were (1) the constitutionality of § 1955; (2) whether the defendants' gambling was "conducted by five or more persons" within the meaning of the statute; and (3) whether the two counts properly charged two different offenses. 478 F.2d at 1020. The court, when it cited the statute, footnoted the fact that the defendants "concede[d] that their activities constituted "gambling" as so defined, and that they were conducted in violation of the law of Indiana." 478 F.2d at 1021 n.2. In *Kaczowski*, the court listed the elements of § 1955(b)(1) and noted in passing that "'gambling' is defined thereunder to include bookmaking. 18 U.S.C. § 1955(b)(2)." The courts in *Hunter* and *Kaczowski* never reached the issue of whether the government must prove that the gambling business in violation of state law also falls within the purported gambling definition in § 1955(b)(2).

## B. The *DiCristina* Court's Definition of "Gambling" is Too Limiting and Should be Given its Common and Plain Meaning

"When interpreting a statute, we must start with the language of the statute. Moreover, in the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning." *Metro One Telecomm., Inc. v. C.I.R.*, 704 F.3d 1057, 1061 (9th Cir. 2012)(citations and internal quotation marks omitted). *See also Transwestern Pipeline Co., LLC v. 17.19 Acres of Property*, 627 F.3d 1268, 1270 (9th Cir. 2010). To determine the plain meaning of terms, the court may look to definitions provided in dictionaries. *Metro One Telecomm.*, 704 F.3d at 1061 (citation omitted). *See Sacco*, 491 F.2d at 1001 (court first looks to the well-settled meaning of the words). Where the plain language of the statute is clear, the court

11

must adhere to it. *Atiyeh*, 402 F.3d at 364 (citations omitted). If the plain language of the statute is not clear, the court then looks to the intent of the legislature. Next, the court examines the decisions in the same jurisdiction. *Sacco*, 491 F.2d at 1001.

As discussed *supra*, a plain reading of 18 U.S.C. § 1955(b)(2) shows the statute itself does not provide a specific definition of what constitutes gambling but rather, it gives a list of examples, which is a non-exhaustive list. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in statute what it says." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

The court in *DiCristina* looked to dictionaries for definitions of gambling. It found that the definitions vary widely. The broad definitions of gambling included "play[ing] a[ny] game for money or property," and the "act of risking something of value, esp. money, for a chance to win a prize." *See DiCristina*, 886 F.Supp.2d at 202 (citations omitted). Other dictionaries defined gambling as limited to playing games of chance for money. *Id.*

In applying the broad definition of gambling, which is a game for money or property, poker qualifies as gambling. This broad definition is consistent with the Guam Code Annotated's definition of gambling, which is a wager involving money or anything of monetary value. *See* 9 G.C.A. § 64.10(a). However, even if this court applies the limited definition of gambling as games of chance for money, poker still qualifies as gambling. "A game of chance" can simply mean as that—a game where chance plays some role into the outcome, regardless of whether it predominates over skill. As defendant DiCristina's expert witness, Dr. Heeb, admitted, "poker definitely is a game which has an element of chance." 886 F.Supp.2d at 169. Further, the *DiCristina* court only arrived at the very technical meaning of poker (predominately a game of skill), after an in-depth analysis that required the assistance of an expert, who provided

12

mathematical calculations and analysis to explain why poker is predominately a game of skill. Thus, to construe poker as "predominately a game of skill" would be in direct contravention to the concept of applying the ordinary, common meaning of a term. Gambling should be given its ordinary and common meaning, which includes the game of poker. After all, as the *DiCristina* court noted, "[p]oker is sometimes treated as a synonym both for gambling generally and for the games enumerated in the IGBA." 886 F.Supp.2d at 202 (citation omitted).

## 1. Federal Courts Have Generally Treated Poker as Gambling

Additionally, the *DiCristina* court acknowledged that "[f]ederal courts have generally treated poker as a game of chance and characterized it as gambling." 886 F.Supp.2d at 197. The court listed the following cases as examples: "*Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999) ("The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens."); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1027 n.5 (2d Cir.1990) ("The games of chance that Connecticut permits at the 'Las Vegas nights' include blackjack, poker, dice, money-wheels, roulette, baccarat, chuck-a-luck, pan game, over and under, horse race games, acey-ducey, beat the dealer, and bouncing ball."); *Percifield v. United States*, 241 F.2d 225, 226 (9th Cir.1957) ("[A]ppellant operated a gambling casino at Rangely, Colorado, known as the Ace–High Club. This contained a bar, a lounge, a cafe, and a casino room where games of chance were played, including blackjack or '21', poker, craps or dice, as well as slot machines."); *Mich. Gambling Opposition v. Norton*, 477 F.Supp.2d 1, 19 (D.D.C.2007) ("Class II gaming [under the Indian Gaming Regulatory Act, see Part V(B)(3)(a), infra] includes games of chance such as bingo or poker."); *Valley Broadcasting Co. v. United States*, 820 F.Supp. 519, 522 (D.Nev.1993) ("Plaintiffs desire to broadcast commercials related to legal gaming activities located in Nevada such as blackjack,

13

craps, poker, roulette, slot machines, and other lawful games of chance."); cf. *United States v. Gotti*, 459 F.3d 296, 342 (2d Cir.2006) (finding that Joker Poker machines were gambling devices under New York law based upon their similarity to poker, as the defendant "concedes that the games in question had the theme of poker, and he has not contended in his brief that chance does not play a material role in the outcome of a poker game"), *cert. denied sub nom.*, *Ciccone v. United States*, 551 U.S. 1144, 127 S.Ct. 3001, 168 L.Ed.2d 726 (2007)." *DiCristina*, 886 F.Supp.2d at 197.

## 2. Legislative Purpose and History

Moreover, the legislative purpose and history of the IGBA do not support the findings of the *DiCristina* court that poker is not covered by the IGBA.

The intent of the legislation was not to bring illegal gambling into federal jurisdiction or to supplant the traditional role of states in regulating gambling. *DiCristina*, 886 F.Supp.2d at 204-05, citing to *Iannelli v. United States*, 420 U.S. 770, 788 (1975) and statement of U.S. Assistant Attorney General Will Wilson, *House Judiciary Hr'gs* at 194. Rather, "[t]he purpose of the statute is simply to make the Federal Government a more effective member of the established State-Federal law enforcement partnership which has long been waging a common war on organized crime and illegal gambling." *DiCristina*, 886 F.Supp.2d at 205, citing to Senator Allott's statement, 116 Cong. Rec. 604 (Jan. 21, 1970). The goal of 18 U.S.C. § 1955 was "to give the Federal Government a new substantive weapon, a weapon which will strike at organized crime's principal source of revenue: illegal gambling." *DiCristina*, 886 F.Supp.2d at 203, citing to S. Rep. No. 91-617, at 71 (1969). Senator Hruska stated that the statute gives "the Attorney General broad latitude to assist local and state government in cracking down on illegal gambling, the wellspring of organized crime's reservoir." 116 Cong. Rec. 601 (Jan. 21, 1970) (quoting

14

Organized Crime Message from the President of the United States, April 23, 1969). As such, the IGBA provides the federal government new tools to assist the states in fighting against large-scale gambling. 116 Cong. Rec. 591 (Jan. 21, 1970), statement of Senator McClellan. "Federal enforcement was seen as particularly necessary in light of what was perceived as a failure to prosecute gambling offenses due to the widespread corruption of state officials by organized crime." *DiCristina*, 886 F.Supp.2d at 203.

As discussed by the *DiCristina* court, several state gaming laws explicitly include poker in their definition of gambling or defined poker as a game of chance. 886 F.Supp.2d at 195 (listing numerous examples of state laws defining poker as gambling). In states that do not explicitly include poker in their gambling definition, state courts nevertheless found that poker is gambling. *Id.* at 196. The *DiCristina* court had not cited to any state law or cases that specifically excludes poker in their gambling definition. "[M]ost courts find that poker is a game of chance. . . . [E]ven the jurisdictions that recognize the great level of skill involved in playing poker nonetheless conclude that the degree of chance involved in the playing of the game renders poker an activity constituting gambling." *DiCristina*, 886 F.Supp.2d at 195, citing to Bennett M. Liebman, *Poker Flops Under New York Law*, 17 Fordham Intell. Prop. Media & Ent. L.K. 1, 19-21 (2006).

Given that states have consistently viewed poker as gambling, this court is not going to view poker any differently. If this court were to apply *DiCristina's* narrow definition of gambling, it would make the statute inapplicable to some gambling businesses that violate state law. This, in turn, would defeat the legislative intent of the IGBA, which was for the federal government to assist the states in prosecuting gambling offenses in order to fight organized crimes.

15

The *DiCristina* court acknowledged that the legislative history lacked information as to why a separate subsection (b)(2) was included in the final version of the statute. *DiCristina*, 886 F.Supp.2d at 205. More importantly, the *DiCristina* court recognized that the legislative history of the statute "did not address  whether it encompassed games of some skill, or merely games predominated by chance." *Id.* at 206. Thus, the *DiCristina* reasoning appears to be a stretch to narrowly define gambling and require that gambling only apply to predominately games of chance, when the legislative history itself makes no mention of such.

### 3.  Other federal statutes

The *DiCristina* court cites to federal statutes wherein gambling is defined as having an element of chance. 886 F.Supp.2d at 228. However, the statutes cited by the *DiCristina* court merely require an element of chance and not chance having to predominate over skills. *See* 15 U.S.C. § 1171 (defining a gambling device as one which involves "the application of an element of chance"); 15 U.S.C. 1178(2) (excluding from the statute devices that do not involve an element of chance); 18 U.S.C. § 1081 (gambling establishments means  . . . playing any game of chance, for money or other thing of value."); and 31 U.S.C. § 5362(1)(A) (a game subject to chance).

### C.  The Rule of Lenity Does Not Apply

The *DiCristina* court found that the arguments presented by both parties are plausible. 886 F.Supp.2d at 223. In light of this and applying the rule of lenity, the court found in favor of the defendant. *Id.* at 224.

The rule of lenity requires the court to "resolve any ambiguity in the scope of a criminal statute in favor of the defendant." *United States v. Miranda-Lopez*, 532 F.3d 1034, 1040 (9th Cir. 2008). "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose,

16

there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 130 S.Ct. 2499, 2508 (2010). *See also United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008) (The language of the statute must be grievously ambiguous.).

In this case, there is no guessing as to what Congress had intended. The *DiCristina* court itself discussed in great detail and in great length the intended purpose of the IGBA. It is clear from the *DiCristina* court's discussion, citing to legislative record, that the purpose of the statute was to curtail the funding sources of organized crime. Gambling, being one of the Mafia's biggest financial sources, was the target of the IGBA statute. While poker was not initially popular with the Mafia, it has become so post-IGBA. *See United States v. Roselli*, 432 F.2d 879, 886 n.8 (9th Cir. 1970), and *DiCristina*, 886 F.Supp. 2d at 211. Thus, it would be most reasonable and in line with the legislative purpose of the statute that this court view poker as gambling.

Additionally, the statute itself contains no grievous ambiguity. The statute states that in order for the Government to prove a violation of "illegal gambling business," the following elements must be met: (1) a violation of the law or a State or political subdivision in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. Also, although the statute itself does not specifically list "poker" in subsection (b)(2), Congress left it broad enough by providing a non-exhaustive list of gambling games, which then allows the inclusion of other gambling games. *See Smith v. United States*, 508 U.S. 223, 239 (1993) ("It may well be that Congress, when it drafted the language . . . had in mind a more obvious use of guns in connection with a drug crime, but the language of the statute is not so limited; nor can we

17

imagine any reason why Congress would not have wished its language to cover this situation.")
(internal brackets omitted).

The rule of lenity is "rooted in fundamental principles of due process which mandate that
no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."
*Nader*, 542 F.3d at 721. *See also McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("Although it
is not likely that a criminal will carefully consider the text of the law before he murders or steals,
it is reasonable that a fair warning should be given to the world in language that the common
world will understand, of what the law intends to do if a certain line is passed. To make the
warning fair, so far as possible the line should be clear."); *Liparota v. United States*, 471 U.S.
419, 427 (1985); *United States v. Velastegui*, 199 F.3d 590, 593 (1999).

A plain reading of 18 U.S.C. § 1955 gives a fair warning to the world that aside from the
games enumerated therein, other games also apply ("includes but is not limited to"). As the
*DiCristina* court acknowledged, poker has been consistently viewed as gambling. *See
DiCristina*, 886 F.Supp.2d at 195. Thus, a reasonable person reading the statute would have a
fair warning of what gambling includes under the IGBA.

If the *DiCristina* interpretation were to be applied, it defeats the purpose of the rule of
lenity, which is to ensure that the statute is clear enough to give fair warning to an individual as
to what is illegal. The government in *DiCristina* argued that the defendant's interpretation, which
the *DiCristina* court adopted, "would require 'an ad hoc analysis of how similar or dissimilar the
game was to those listed in IGBA's list of examples,' creating an 'extraordinarily complex and
unpredictable approach to the statute.'" 886 F.Supp. 2d at 224. The court acknowledged this
argument but stated that "given the ambiguities in the statute, such case-by-case analysis in
ambiguous cases is what the statute, interpreted in light of the rule of lenity, demands." *Id.*

To apply the *DiCristina* interpretation, one would require experts such as Dr. Heeb, to

18

conduct an extensive study and technical analysis to arrive at whether a certain game would fall under the category of predominately a game of chance or skill. This is obviously not a practical way for someone trying to figure out what games are illegal under the statute. As the Government in the instant case stated, "[i]f 'gambling' concerns activity that violates state law, a citizen is on notice, because he can look up the state statutes and see exactly what is prohibited. But if 'gambling' does not tie the prohibited conduct to a specific state statute, how is a citizen to know whether his conduct 'includes' but is 'not limited to' poolselling, bookmaking, etc.?" *See* Opp'n., ECF 239 at 5-6. The *DiCristina* interpretation only renders the statute void for vagueness. *See United States v. Makowski*, 120 F.3d 1078, 1080 (9th Cir. 1997) ( "A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited. Thus, the Fifth Amendment due process clause requires a statute to be sufficiently clear so as not to cause persons 'of common intelligence ... necessarily [to] guess at its meaning and 'to differ as to its application.' ") (citations omitted).

### D. *Ejusdem Generis* Does Not Apply When Plain Meaning is Apparent

The *DiCristina* court applied the rule of *ejusdem generis* by finding that "[i]n light of the ambiguities in the federal definition of gambling, governing criteria must be derived by determining what common characteristics unifies the games listed in § 1955(b)(2) into a cohesive group." 886 F.Supp. 2d at 226 (citation omitted). The *DiCristina* court found that poker is not sufficiently similar to the nine games enumerated in § 1955(b)(2), because unlike those games, poker is predominately a game of skill. *Id.* at 225-34.

As discussed *supra*, the plain meaning of the statute in question is apparent. Therefore, the rule of *ejusdem generis* does not apply. *See United States v. Powell*, 423 U.S. 87, 91 (1975) ("The rule of ejusdem generis, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is *uncertainty*. . . [I]t may not be used to

defeat the obvious purpose of legislation.") (citation omitted and emphasis added); *see also*

*United States v. Tobeler*, 311 F.3d 1201, 1206 (9th Cir. 2002) ("When a statute's plain meaning

is apparent, there is no need to resort to the rule of *ejusdem generis,* particularly when its

application leads to a result undermining the statutory purpose.").

More importantly, the Ninth Circuit has held that when Congress uses the phrase

"including, but not limited to" along with the enumeration of terms, courts "need not apply

*ejusdem generis* because…[t]hat phrase 'mitigate[s] the sometimes unfortunate results of rigid

application of the ejusdem generis rule.'" *United States v. Migi*, 329 F.3d 1085, 1089 (9th Cir.

2003) (quoting *Ramirez, Leal & Co. v. City Demonstration Agency*, 549 F.2d 97, 104 (9th Cir.

1976)). In the instant case, Congress did in fact use the phrase "includes but is not limited to" in

18 U.S.C. § 1955(b)(2). Accordingly, this court need not apply the rule of *ejusdem generis.*

## IV.  CONCLUSION

Based on the discussion above, Defendants Ho and Hsieh's Motion to Dismiss Count 2

and all related counts of the Second Superseding Indictment, is hereby **DENIED**.

The following trial schedule is hereby issued:

- ▪ The following must be filed or lodged with the court by …………. May 3, 2013

    - o **An original and one copy of the witness list.** Witness lists must include legal names, aliases, nicknames, village/city of residence, and place of employment.
    - o **Proposed  *Voir Dire*  Questions, Proposed Jury Instructions with source noted, and Proposed Verdict Forms.**
    - o **An original and three copies of the exhibit list.** Government's exhibits shall be numbered and Defendants' exhibits shall be lettered.
    - o **Three complete sets of marked and tabbed exhibits in three-ring binders, with each binder containing a filed copy of the exhibit list.** The exhibits shall include those items which may be introduced for identification into evidence but not necessarily proffered for admission, i.e., police/investigative reports or witness statements. The parties shall meet and confer sufficiently in advance of trial and formulate a set of joint exhibits. Those exhibits upon which agreement cannot be reached shall be submitted separately by each respective party.

- **Final Pretrial Conference** shall be held …...……………May 21, 2013 at 1:30 p.m.

- **Jury Selection and Trial** shall be held on……….............June 4, 2013 at 9:30 a.m.


**SO ORDERED.**

**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Apr 12, 2013**